**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BRENDA G. ROBINSON,         )   NO. CV 10-8111-SS
                              )
             Plaintiff,     )
                              )
         v.           )
                              )   **MEMORANDUM DECISION AND ORDER**
MICHAEL J. ASTRUE,        )
Commissioner of the Social   )
Security Administration,    )
                              )
             Defendant.     )
_____)

**I.**

**INTRODUCTION**

Brenda G. Robinson ("Plaintiff") brings this action seeking to overturn the decision by the Commissioner of the Social Security Administration (hereinafter the "Commissioner" or the "Agency") denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is AFFIRMED.

**II.**

**PROCEDURAL HISTORY**

Plaintiff filed an application for SSI on August 21, 2006 and DIB on August 28, 2006. (Administrative Record ("AR") 121-133). She alleged a disability onset date of December 31, 2002 (AR 121), due to "[b]ad back, scoliosis, back spasms, bone deterioration [and] arthritis." (AR 144). Plaintiff subsequently amended her disability onset date to November 1, 2004. (AR 160). The Agency initially denied this claim on January 5, 2007. (AR 70).

Plaintiff's claim was reconsidered, and subsequently denied by the Agency on March 30, 2007. (AR 79). Plaintiff then requested a hearing (AR 86), which was held on May 21, 2008 before an Administrative Law Judge ("ALJ"). (AR 98). Plaintiff testified at the hearing while represented by an attorney. (AR 27). On October 22, 2008, the ALJ issued a decision denying benefits. (AR 18-26).

Plaintiff's request for review of the ALJ decision was denied by the Appeals Council on September 3, 2010, (AR 1), making the ALJ decision the final decision of the Agency. On October 27, 2010, Plaintiff commenced the instant action.

**III.**

**FACTUAL BACKGROUND**

Plaintiff was born on February 18, 1953. (AR 121). Prior to her alleged disability onset date, Plaintiff worked a variety of jobs

including: home attendant; cafeteria server; retail sales clerk; child monitor; and companion/caregiver.  (AR 221).  On July 21, 2003, a different ALJ found that Plaintiff was capable of performing light work (AR 180), but she failed to prosecute her appeal on that determination.

**A.  Plaintiff's Medical History**

On February 14, 2001, Dr. Frank W. Cunningham diagnosed Plaintiff with "chronic ten-year episodic low back pain, present status low back pain radiculitis, but no radicululopathy."  (AR 176).  On October 29, 2001, she began taking Albuterol for asthma treatment.  (Id.). Afterwards, Plaintiff made frequent and continuous visits to the AltaMed Community Health Clinic ("AltaMed").  (AR 226-369, 405-20, 426-28). While the majority of these visits were for prescription refills, there were numerous occasions in which Plaintiff sought treatment for her alleged disabilities, consisting of lower back pain, leg pain, and respiratory issues.  (Id.).

On January 17, 2002, Plaintiff visited AltaMed because she felt back and hip pain.  (AR 294).  An x-ray of the right hip revealed "no evidence of fracture or dislocation.  No significant degenerative or destructive changes [were] identified."  (AR 342).  Instead, the evidence showed "mild degenerative changes . . . [o]steopenia." (Id.). Similarly, an x-ray of Plaintiff's lumbar spine showed only "mild disc space narrowing" and "lumbar scoliosis with convexity to the right." (Id.).

1    Plaintiff returned to AltaMed on March 22, 2002 with pain in her
2    right leg. (AR 287). However, an x-ray showed no "evidence of fracture
3    or dislocation. Moreover, no significant degenerative or destructive
4    changes [were] identified." (AR 341). On April 12, 2002, Plaintiff
5    visited AltaMed complaining of a cough. (AR 286). The treating
6    physician expressed concern for Plaintiff's smoking and prescribed
7    "Bupropion HCI" for smoking cessation. (Id.). On August 10, 2002,
8    Plaintiff expressed concern for a new pain in the back of her neck. (AR
9    282). An x-ray did not reveal a "fracture, dislocation, or significant
10   degenerative change," but there was "evidence of straightening of the
11   cervical spine most consistent with muscle spasm." (AR 340).

12

13   On November 19, 2002, Plaintiff went to AltaMed for a full checkup.
14   (AR 337). An x-ray of her chest showed that the heart was normal and
15   free of a "cardiopulmonary disease event." (Id.). On January 13, 2002,
16   Plaintiff returned to AltaMed complaining of pain in her right hand that
17   had lingered for six days. (AR 269). The x-ray returned
18   "satisfactory," without signs of degeneration or other serious issues.
19   (AR 336).

20

21   Over the next few years, Plaintiff returned to AltaMed primarily to
22   refill her prescriptions. (AR 228-68). During most prescription
23   appointments, Plaintiff expressed continued pain in her lower back and
24   right leg. (Id.). However, none of her x-rays revealed significant
25   degeneration of muscles or bones, nor were there any signs of
26   respiratory issues. (AR 331-42). Moreover, Plaintiff's routine checks
27   (i.e., cancer, cholesterol, diabetes) also failed to indicate
28   significant health issues. (AR 297-330). Medical records from January

4

5, 2007 to April 10, 2008 reflect Plaintiff's consistent pattern of returning to AltaMed with complaints.  However, no serious issues were ever discovered.  (AR 405-20, 426-28).

In addition to AltaMed, Plaintiff went to Pomona Valley Hospital for "chest pressure" with "some left arm tingling and leg swelling" on December 14, 2004.  (AR 433).  When her tests returned normal, the treating physician gave her Vicodin and Motrin for the pain.  (Id.).  On October 20, 2006, Plaintiff went to Los Angeles County-USC Medical Center for stomach pains.  (AR 371).  Tests revealed a gastric ulcer without signs of a tumor.  (AR 372).  From April 30, 2007 to May 2, 2007, Plaintiff was hospitalized again at Pomona Valley Hospital for headaches and nausea.  (AR 391).  An emergency CAT scan was negative, and Plaintiff was given medication for her pain before being discharged.  (Id.).  On February 9, 2009, Plaintiff was readmitted to Pomona Valley Hospital complaining of "shortness of breath, asthma exacerbation, peptic ulcer disease, headache, and COPD."  (AR 513).  Tests revealed that Plaintiff suffered from pnuemonia and influenzia.  (Id.).  Dr. Amit Paliwal recommended that she stop smoking. However, Plaintiff did not comply.  (AR 519).

**B.**   **Examining Sources**

On November 1, 2006, Dr. Bryan To conducted an independent internal medicine evaluation of Plaintiff.  (AR 375).  According to Dr. To, Plaintiff's "back pain elicits some minor findings of nerve root irritation. Straight-leg raise was positive. [Plaintiff's] range of motion was decreased."  (AR 377).  However, Dr. To found "no evidence of

deformities, swelling, or tenderness" of Plaintiff's joints despite Plaintiff's complaints of pain throughout the exam. (Id.). Moreover, Dr. To found no evidence of respiratory distress. (Id.). Dr. To concluded that Plaintiff could frequently carry up to ten pounds and occasionally carry up to twenty pounds. (Id.). Further, Dr. To concluded that Plaintiff could stand and walk for up to six hours in an eight-hour workday and that there were no restrictions on how long Plaintiff could be seated during an eight-hour work day. (AR 378). Dr. To also opined that Plaintiff could occasionally walk on uneven terrain, climb ladders, and work with heights. (Id.). Additionally, he found that Plaintiff could bend, kneel, stoop, crawl, and crouch occasionally. (Id.).

On April 10, 2008, one of Plaintiff's treating physicians, Dr. Christian Rico, submitted a residual functional capacity ("RFC") questionnaire based on his monthly interactions with Plaintiff, which began in April 2003. (AR 422). Dr. Rico opined that Plaintiff could occasionally lift up to ten pounds, rarely lift up to twenty pounds, and never lift more than 50 pounds. (AR 424). Further, Dr. Rico found that Plaintiff could stand and walk less than two hours out of an eight-hour work day with normal breaks and sit for up to four hours out of an eight-hour work day with normal breaks. (Id.).

Dr. Rico opined that emotional factors do not contribute to the severity of Plaintiff's symptoms, but also checked off "depression" and "anxiety" as "psychological conditions affecting her physical condition." (AR 423). However, he did not cite any psychological tests or treatment. Additionally, Dr. Rico listed shortness of breath related

to chronic obstructive pulmonary disease as a limiting factor, but asserted that Plaintiff's "impairment is mostly with her back pain." (AR 425).

## C.   <u>Consultative Sources</u>

On November 20, 2006, consulting physician B. X. Vaghaiwalla submitted a physical residual functional capacity assessment based on the evidence in Plaintiff's file. (AR 380). According to Dr. Vaghaiwalla, Plaintiff could occasionally lift or carry up to twenty pounds, and frequently lift or carry up to ten pounds. (AR 381). Further, Dr. Vaghaiwalla found that Plaintiff could stand and walk for up to six hours in an eight-hour workday and sit up to six hours in an eight-hour workday. (<u>Id.</u>). Dr. Vaghaiwalla also concluded that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (AR 382). However, Dr. Vaghaiwalla opined that Plaintiff should avoid concentrated exposure to extreme cold and heat, fumes, odor, dust, gases, poor ventilation, and hazardous machinery and heights. (AR 383).

## D.   <u>Vocational Expert's Testimony</u>

Steven M. Berry, a vocational expert ("VE"), testified at Plaintiff's hearing. (AR 49). After receiving a complete list of Plaintiff's past work experience and duties, Mr. Berry concluded that Plaintiff could perform some of her past work. (AR 58). Specifically, Mr. Berry stated that "the Companion job can be performed . . . the Cafeteria Worker in that part of the time was spent as a Menu Maker . . . the Child Monitor jobs as she performed them and as very often are

performed at the light exertional level . . . and the Retail Sales Clerk." (Id.).

Mr. Berry stated that there are jobs in the national economy that fit Plaintiff's working capacity. (Id.). Specifically, he asserted that there were 2,000 regional (24,000 national) openings for the unskilled and light exertional position of Informational Clerk. (Id.). Further, Mr. Berry reported that there were 6,000 regional (72,000 national) positions for Cashier II, which is also a "light exertional level, unskilled" job. (AR 58-59). Mr. Berry also reported 14,000 regional (160,000 national) Small Parts Assembly jobs. (Id.).

**E.   Plaintiff's Testimony**

At the 2008 hearing, Plaintiff testified that the only exercise she performs is "sit[ting] on the bed and kick[ing] [her legs]" for "[m]aybe 20 minutes." (AR 35-36). She showers and dresses herself without assistance. (AR 36). Plaintiff stated that from November 2005 to April 2006, she had a part-time job babysitting teenage girls for three hours a day, five days a week. (AR 42-43). Prior to that, Plaintiff explained that she worked as a bus driver for disabled adults, which ended when her doctor "put [her] on limitations due to [her] back." (AR 44). Plaintiff confirmed that she "sometimes" had trouble breathing, and that the pain in her legs and her back prevent her from working because she gets spasms. (AR 45).

Plaintiff also testified about her work experience prior to her alleged onset date of disability. (AR 51-57). Specifically, Plaintiff

8

asserted that in 2000, she worked as a retail clerk at a thrift store for 20 hours a week. (AR 51). Then she was a menu maker for Robert Sherman for eight months on a full-time schedule in 1997-1998. (AR 52-53). While working for Mr. Sherman, Plaintiff cooked and provided in-home services. (AR 53). In her capacity as menu maker, Plaintiff testified that she served trays of food, made menus, and lifted a maximum of twenty pounds. (AR 56). Plaintiff confirmed that she worked as a menu maker in 1999 as well, along with babysitting for three months in the summer. (AR 55). After those positions, Plaintiff worked as a caregiver. (AR 53). As a caregiver, Plaintiff assisted elderly persons with personal hygiene, bathing, dressing, cooking, running errands, cleaning, and never lifted more than twenty pounds. (AR 56-57).

**F. Consultant's Testimony**

At Plaintiff's 2008 hearing, consulting physician Dr. Joseph E. Jensen testified that Plaintiff's medical history would limit her functionality in the following ways:

> To the point of only occasionally being able to lift and carry to 20 pounds [sic] or ten pounds frequently, a combine [sic] standing and walking a total of six hours, sitting six hours in an eight-hour day with the opportunity every 60 minutes to, at the work site, change position from up to five minutes. Postural activities, she could occasionally manage stairs, ramps, could occasionally stoop, crouch, kneel, and crawl. She could occasionally walk on uneven terrain and a pedal operation with either foot could be occasional but not

frequent.   Use of her upper extremities for gross and fine manipulation frequent but not constant.   She would be precluded from working at unprotected heights or climbing of ladders, ropes, or scaffolding, and, I believe, that would cover the physical limitations.

(AR 48-49).  Plaintiff's counsel declined an opportunity to question Dr. Jensen.  (AR 49).

## IV.

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).   The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

---

[1]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows:

(1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing her past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner may do so by the testimony of a VE or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a VE. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

**V.**

**THE ALJ'S DECISION**

The ALJ concluded that Plaintiff was not disabled after employing the five-step sequential evaluation process. (AR 20-25). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 22, 2003. (AR 20). At step two, the ALJ found that Plaintiff's impairment was severe because of "chronic low back pain, osteoarthritis of the lumbar spine and right hip, cervical and lumbar spondylosis, and chronic obstructive pulmonary disease with occasional shortness of breath and [she] is obese which in combination result in

12

more than minimal limitations on her ability to perform work related tasks." (AR 21).

At step three, the ALJ found that Plaintiff's severe impairment did not meet, and was not medically equivalent to, a listed impairment. (Id.). At step four, the ALJ adopted the following RFC:

> [Plaintiff] has the residual functional capacity to perform light work which permits lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for six hours out of an eight-hour day, and standing/walking for six hours out of an eight-hour day with a change of position briefly up to five minutes every hour; no walking over uneven terrain; occasional use of the upper extremities for pushing and pulling and occasional use of the lower extremities for pushing and pulling and operating foot controls; no climbing ladders/scaffolds, but occasional climbing stairs, bending, balancing, stooping, kneeling, crouching, and crawling; frequent but not continuous handling/gross manipulation as in grasping, twisting, turning, objects with both hands; frequent but not continuous fine manipulation dexterity/fingering with both hands; no working at unprotected heights; and no concentrated exposure to dust, fumes or gases.

(AR 21).

The ALJ supported this finding by concluding that while Plaintiff's "impairments could reasonably be expected to produce the alleged

symptoms . . . [Plaintiff's] statements concerning the intensity, persistence and limiting effect of [her] symptoms are not entirely credible." (AR 23). Specifically, the ALJ pointed to x-rays of Plaintiff's hip, leg, lower back, and neck that were not consistent with Plaintiff's complaints. (Id.). Moreover, the ALJ relied on Dr. To's assessment of Plaintiff's back, which found that "[s]traight leg was positive, but motor strength, reflexes and sensation were all normal." (Id.). Further, the ALJ asserted that Plaintiff's complaints of asthma were not consistent with a chest x-ray, which showed "no acute cardiopulmonary disease," or examinations of Plaintiff's heart and lungs in November 2006, which were normal. (Id.). The ALJ then asserted that all of Plaintiff's hospital diagnostic studies were negative for any pathologies, and pointed out that Plaintiff was always discharged in a stable condition. (Id.). Additionally, the ALJ concluded that Plaintiff's RFC was consistent with the opinions of consulting medical expert Dr. Jensen, and examining physician Dr. To. (Id.).

    The ALJ discounted the opinion of Plaintiff's treating physician, Dr. Rico. (AR 24). The ALJ first noted that Dr. Rico's opinion was "excessive in view of the contradictory functional assessments given by Dr. To, Dr. Jensen, and the State Agency reviewer, and in view of the nature and extent of the claimant's treatment." (AR 24). Further, the ALJ observed that Dr. Rico's checked-off findings that "depression and anxiety as contributing factors" to Plaintiff's physical condition, was not supported by records of psychiatric treatment or counseling. (Id.). Finally, the ALJ pointed out that while Dr. Rico's recommendations called for Plaintiff to stop smoking, there is no indication that she ever followed through with his advice. (AR 24-25).

14

1  The ALJ determined that Plaintiff could perform light exertional
2  past work.  (AR 23).  Based on the testimony of the vocational expert,
3  the ALJ concluded that Plaintiff could perform her past relevant work as
4  cafeteria worker, companion, child monitor, and retail sales person.
5  (AR 25).  Consequently, the ALJ determined that Plaintiff was not
6  disabled.  (Id.).

7
8                              **VI.**
9                       **STANDARD OF REVIEW**
10
11  Under 42 U.S.C. § 405(g), a district court may review the
12  Commissioner's decision to deny benefits.  A court may set aside the
13  Commissioner's decision when the ALJ's findings are based on legal error
14  or are not supported by substantial evidence in the record as a whole.
15  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v.
16  Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

17
18  "Substantial evidence is more than a scintilla, but less than a
19  preponderance."  Reddick, 157 F.3d at 720.  It is "relevant evidence
20  which a reasonable person might accept as adequate to support a
21  conclusion."  (Id.).  To determine whether substantial evidence supports
22  a finding, the court must "'consider the record as a whole, weighing
23  both evidence that supports and evidence that detracts from the
24  [Commissioner's] conclusion.'"  Aukland, 257 F.3d at 1035 (quoting Penny
25  v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can
26  reasonably support either affirming or reversing that conclusion, the
27  court may not substitute its judgment for that of the Commissioner.
28  Reddick, 157 F.3d at 720-21.

**VII.**

**DISCUSSION**

**A.   The ALJ Provided Specific And Legitimate Reasons To Reject Dr. Rico's Opinion**

Plaintiff argues that the ALJ rejected Dr. Rico's opinion without providing specific, legitimate reasons, and that "[t]he ALJ . . . committed legal error by rejecting outright Dr. Rico's opinions when, in fact, the ALJ still should have considered Dr. Rico's opinions as to whether it is [sic] still entitled to the greatest weight and should be adopted even if it was not entitled to controlling weight." (Complaint Memorandum ("Complaint Memo.") at 9).   Additionally, Plaintiff argues that the ALJ improperly rejected Dr. Rico's opinion concerning Plaintiff's mental limitations. (Id. at 10).   Specifically, Plaintiff argues that Dr. Rico's opinion was based primarily on physical limitations and that the mental diagnosis was not dispositive in Dr. Rico's overall opinion. (Id.).   The Court disagrees.

If the treating physician's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing specific, legitimate reasons, supported by substantial evidence in the record. Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).   However, the ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings. Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1195 (9th Cir. 2004).

16

The opinion of a consultative examiner, if supported by clinical tests and observations upon examination, is substantial medical evidence and may be relied upon by the ALJ in order to determine the claimant's RFC.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  It is solely the duty of the ALJ to resolve a conflict between a consultative examiner opinion and a treating physician's opinion.  Id.

Here, the ALJ provided specific and legitimate reasons supported by substantial evidence in the record to reject Dr. Rico's opinion. Lester, 81 F.3d at 830-31.  Specifically, the ALJ correctly found that Dr. Rico's opinion was "excessive in view of the contradictory functional assessments given by Dr. To, Dr. Jensen, and the State Agency reviewer, and in view of the nature and extent of the [Plaintiff's] treatment."  (AR 24).  While Dr. Rico opined that Plaintiff could only lift ten pounds occasionally, be on her feet for only two hours in an eight-hour work day, and sit for only four hours in an eight-hour day (AR 424), Dr. To found that Plaintiff could frequently lift ten pounds, occasionally lift twenty pounds, be on her feet for up to six hours in an eight-hour day, and that Plaintiff had no sitting limitations.  (AR 375).  Dr. To's opinion incorporated the results of Plaintiff's x-rays, which never showed signs of serious degeneration of muscles or bones, or any disabling respiratory issues.  (AR 331-42).  Further, Dr. To's opinion is consistent with the results from Plaintiff's exams.  (AR 297-330).  Relying on the same medical evidence, Dr. Jensen's testimony (AR 48-49) and Dr. Vaghaiwalla's report (AR 381) confirmed that Plaintiff could perform light work.  20 C.F.R. § 404.1537(b).

17

1      Additionally, the ALJ correctly noted that Plaintiff's treatment
2  record does not support Dr. Rico's extreme findings. (AR 24). Although
3  Dr. Rico believes that Plaintiff's medications "do not adequately
4  control her pain" (AR 424), none of Plaintiff's diagnostic tests
5  corroborate the degree of pain she expressed. (AR 331-42, 391).
6  Moreover, after examining Plaintiff, Dr. To determined that there was
7  "no evidence of deformities, swelling, or tenderness" of Plaintiff's
8  joints, nor did he find evidence of respiratory issues. (AR 377). The
9  ALJ also correctly noted that Plaintiff received "generally conservative
10 treatment relative to her complaints." (AR 24). Further, Plaintiff's
11 failure to adhere to the physicians' repeated recommendations to stop
12 smoking and perform exercise also undermines Dr. Rico's assessment. See
13 Warre v. Comm'r, 439 F.3d 1001, 1006 (9th Cir. 2006) (reasoning that
14 impairments that can be controlled are not disabling).

15

16     The ALJ also properly determined that Dr. Rico's assessment that
17 "depression and anxiety contributed to [Plaintiff's] physical condition"
18 was not supported by diagnostic tests or treatment records. (AR 24).
19 The medical record, including Dr. Rico's records, are devoid of any
20 treatment or diagnostic records pertaining to mental limitations.
21 Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (finding that
22 an ALJ properly relied on inconsistencies between the treating doctor's
23 opinion and the medical record to discredit the opinion). Moreover,
24 Dr. Rico does not appear to be a psychiatrist or psychologist, so his
25 opinions on mental health issues are entitled to less weight. Holohan,
26 246 F.3d at 1202-03, n.2 (finding that a treating physician's opinion is
27 entitled to less weight if it pertains to matters outside the
28 physician's expertise). Thus, the ALJ correctly relied on the

inconsistency between Dr. Rico's opinion and the medical record as a specific and legitimate reason to reject Dr. Rico's opinion.

Finally, the ALJ properly considered the fact that Plaintiff failed to adhere to Dr. Rico's treatment advice concerning walking and smoking. (AR 24-25). Although Dr. Rico opined that Plaintiff's chief complaint revolves around back pain, he listed shortness of breath related to chronic obstructive pulmonary disease as another disabling factor. (AR 425). The ALJ was correct in pointing out that Plaintiff was still smoking despite Dr. Rico's advice to quit (AR 427), and Plaintiff admitted that she did not walk and only did leg exercises in bed. (AR 35-36). Dr. Rico's recommendations suggest that at least a portion of Plaintiff's limitation could be mitigated by following Dr. Rico's advice, which the ALJ properly considered when she discredited Dr. Rico's assessment. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982) (finding that an ALJ is entitled to draw inferences that logically flow from the evidence). In sum, the ALJ provided specific and legitimate reasons supported by substantial evidence in the record to reject Dr. Rico's opinion.

**B.   The ALJ Properly Determined That Plaintiff Could Perform Her Past Relevant Work**

Plaintiff argues that she cannot perform her past relevant work. (Complaint Memo. at 3-8). Specifically, Plaintiff argues that her average monthly income in 1999, 2000, 2004, 2005 and 2006 fell below the threshold average monthly income to be considered substantial gainful activity and therefore excluded certain jobs from being classified as

19

1   past relevant work.    (Id.).    Further, Plaintiff concedes that her
2   position as a Home Attendant qualifies as past relevant work, but argues
3   that the demands of that position exceed Plaintiff's residual functional
4   capacity.   (Id. At 7).   The Court disagrees.

6       Past relevant work is "work that [a claimant has] done within the
7   past 15 years, which was substantial gainful activity, and that lasted
8   long enough for [the claimant] to learn to do it."   20 C.F.R. §§
9   404.1560(b)(1) and 416.960(b)(1).   Substantial gainful activity is
10  defined as "work activity that involves doing significant physical or
11  mental activities . . . that [a claimant does] for pay or profit."   20
12  C.F.R. §§ 404.1572 and 416.972.   A presumption that a person engaged in
13  substantial gainful activity is made if that person's average monthly
14  income exceeded $500 per month for any period between 1990 and June
15  1999, or exceeded $700 per month for any period between July 1999 and
16  December 2000.   20 C.F.R. §§ 404.1574 and 416.974.   However, earnings
17  alone is not dispositive and other factors may rebut the presumption,
18  such as "the time spent working, quality of a [claimant's] performance,
19  special working conditions, and the possibility of self-employment."
20  Katz v. Sec. of Health and Human Servs., 972 F.2d 290, 293 (9th Cir.
21  1992).

23      The Agency calculates monthly earnings by "averag[ing] earnings
24  over the entire period of work." 20 C.F.R. §§ 404.1574a(a) and
25  416.974a(a) (emphasis added); see also Anderson v. Heckler, 726 F.2d
26  455, 457 (8th Cir. 1984) (holding that monthly earnings are calculated
27  by averaging earnings over months actually worked instead of averaging
28  earnings over the entire year).   If a claimant's earnings level or work

pattern significantly changes during the period of work, the Agency will average earnings during each period of work separately.   20 C.F.R. §§ 404.1574a(b)&(c) and 416.974a(b)&(c).

Plaintiff claims that average monthly income is defined as annual income divided by twelve months, regardless of the number of months she actually worked. (See Complaint Memo. at 4-5).   Plaintiff's interpretation is inconsistent with the language of 20 C.F.R. sections 404.1574a(a) and 416.974a(a).   Specifically, the phrase "the entire period of work" clearly indicates only the time actually employed. Anderson, 726 F.2d at 457.   Therefore, the Court finds average monthly income to mean total income divided by the number of months that a claimant actually worked.

Because the ALJ determined that Plaintiff has not engaged in substantial gainful activity since July 22, 2003, (AR 20), any work after this date does not qualify as substantial gainful activity and cannot be considered past relevant work.   See 20 C.F.R. §§ 404.1560 and 416.960.   Therefore, Plaintiff's challenges regarding 2004 and 2005 are irrelevant, and this Court will address only Plaintiff's challenges regarding employment prior to July 22, 2003.

Substantial evidence in the record supports the ALJ's conclusion that Plaintiff's past relevant work as a cafeteria worker, companion, and retail salesperson qualified as substantial gainful activity.   (AR 25).   Plaintiff testified that she worked for six months in 2000, earning $8337.07 as a retail salesperson.   (AR 51, 137).   Plaintiff's average monthly income was roughly $1,389.51, exceeding the $700 minimum

monthly income for 2000. 20 C.F.R. §§ 404.1574 and 416.974. Therefore, the ALJ properly presumed that Plaintiff engaged in substantial gainful activity in 2000 as a retail salesperson. Katz, 972 F.2d at 293. Additionally, Plaintiff's income while working as a companion/caregiver[2] in 1997 and 1998, over $22,000 (AR 137), clearly surpassed the threshold for creating a presumption of substantial gainful activity.[3] 20 C.F.R. §§ 404.1574 and 416.974.

Plaintiff failed to refute the presumption that this work constituted substantial gainful activity because she did not establish that "the time spent working, [the] quality of [her] performance, special working conditions, [or] the possibility of self-employment" showed that she did not engage in substantial gainful activity. Katz, 972 F.2d at 290. As a result, the ALJ properly found that Plaintiff's jobs as a retail salesperson, companion, and cafeteria worker were substantial gainful activity.

It is unclear whether Plaintiff's work as a babysitter for three months in 1999 qualifies for a presumption of substantial gainful activity because there is evidence that Plaintiff also worked as a menu maker in that year for an undisclosed amount of time. (AR 54-55). While Plaintiff earned a total of $5,462.27 in 1999, there is nothing in

---

[2]  The ALJ properly determined that this job entailed duties fitting both cafeteria worker and companion, as discussed later in this opinion. (AR 25).

[3]  In both 1997 and 1998, Plaintiff earned over $22,000. (AR 137). Even assuming Plaintiff worked the entire twelve months for these years, her monthly earnings were well over the $500 minimum requirement.

22

the record to reveal exactly how much of that amount was attributable to babysitting. (AR 54-55, 137). Therefore, it cannot be determined whether Plaintiff's babysitter position rose to the level of substantial gainful activity. Even if child monitor was erroneously included under Plaintiff's past relevant work, the error is harmless because Plaintiff's valid past relevant work experience still supports the ALJ's finding that Plaintiff was not disabled. See Carmickle v. Comm'r, 533 F.3d 1155, 1162 (9th Cir. 2008) (finding that because the ALJ's error was inconsequential to the ultimate non-disability determination, no remand was required); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless.").

Plaintiff next argues that her prior positions with the Claudette Dorothy Brisk Estate and Mr. Shermer should be properly classified under the Dictionary of Occupational Titles ("DOT") definition of "home attendant" instead of cafeteria worker and companion. (Complaint Memo. at 6). The Court disagrees.

An ALJ may not classify past relevant work under general headings, Vertigan v. Halter, 260 F.3d 1044, 1051-52 (9th Cir. 2001), or characterize a claimant's past occupations based on an isolated duty within his past occupation. Valencia v. Heckler, 751 F.2d 1082, 1086 (9th Cir. 1985). However, an ALJ may classify a position based on either the claimant's actual past functions or the functions generally required of that position in the national economy even if the description does not account for all of a claimant's prior duties.

1  <u>Sanchez v. Sec. of Health and Human Servs.</u>, 812 F.2d 509, 511 (9th cir.
2  1987); 20 C.F.R. § 404.1560(b)(2).

3

4      The ALJ found that Plaintiff's past relevant work history included
5  cafeteria worker and companion, basing her conclusion on the VE's
6  testimony classifying Plaintiff's past relevant work under the DOT
7  definitions. (AR 25). At the hearing, the VE stated that "[t]he Menu
8  Maker job referred to, it appears to be a Cafeteria Worker or Server,
9  DOT number 311.677-010, light exertional level, unskilled, SVP 2 . . .
10 some of the Caregiver jobs fall into the category or classification as
11 a Companion, DOT number of 309.677-010, light exertional level, semi-
12 skilled, SVP 3." (AR 57). The VE made his assessment after reviewing
13 the evidence, listening to Plaintiff's testimony, and questioning
14 Plaintiff directly. (AR 49, 55-57).

15

16     The DOT defines a cafeteria worker as someone who can carry trays
17 of food from counters to patrons and clean tables. DICOT 311.677-010,
18 1991 WL 672694. This position is classified as light work requiring
19 carrying up to twenty pounds occasionally and ten pounds frequently.
20 <u>Id.</u> Plaintiff's RFC comports with the requirements (AR 21), and
21 Plaintiff confirmed that she had experience serving trays of food while
22 working for San Gabriel Hospital as well as Mr. Sherman. (AR 55-56).
23 Therefore, the ALJ's finding that Plaintiff's prior relevant work
24 included cafeteria worker was proper.

25

26     The DOT defines a companion as a domestic service occupation that
27 requires light work. DICOT 309.677-010, 1991 WL 672667. The DOT
28 describes a companion as someone who tends to the personal needs of an

employer and makes food for the employer.  Id.  While working for Mr. Sherman, Plaintiff confirmed that she made food and provided "in-home services," and that she never lifted more than twenty pounds.  (AR 56). These duties appear to have been the essence of her job and she did not mention other duties.  (See id.).  Plaintiff's description of her past work comports to the description contained in the DOT as well as the VE's opinion.  The record supports the ALJ's conclusion that Plaintiff's past relevant work included a companion position.  No remand is required.

## VIII.

### CONCLUSION

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g), IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: October 6, 2011

```
                              _____/S/_____
                              SUZANNE H. SEGAL
                              UNITED STATES MAGISTRATE JUDGE
```

**THIS MEMORANDUM IS NOT INTENDED FOR PUBLICATION NOR IS IT INTENDED TO BE INCLUDED IN OR SUBMITTED TO ANY ONLINE SERVICE SUCH AS WESTLAW OR LEXIS.**